**LOS ANGELES WATERKEEPER®**

May 24, 2024

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

AireMasters Air Conditioning
ATTN: Managing Agent
12556 McCann Drive
Santa Fe Springs, CA 90670

Charles E Thompson
Agent for Service of Process
Scorpio Enterprises, Inc.
12556 McCann Drive
Santa Fe Springs, CA 90670

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of Los Angeles Waterkeeper ("LAWK") regarding violations of the Clean Water Act[1] and California's General Permit for Storm Water Discharges Associated with Industrial Activities[2] ("Industrial General Permit"), occurring at the Aire Masters Air Conditioning facility at 12556 McCann Drive, Santa Fe Springs, California, 90670 ("Facility"). The purpose of this letter is to put Scorpio Enterprises, Inc. (doing business as AireMasters) ("AireMasters" or "Owners and/or Operators"), as the owner and/or operator of the Facility, on notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Industrial General Permit are violations of the Clean Water Act. As explained below, AireMasters is liable for violations of the Industrial General Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action, a citizen must give notice of their intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation.[3] This notice letter ("Notice Letter") is being sent to you individually and as the responsible Owners and/or Operators of the Facility or as the registered agent for the Owners and/or Operators. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Facility Owners and/or Operators that LAWK intends to file a federal enforcement action against AireMasters for violations of the Industrial General Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

## 1.    BACKGROUND

### 1.1. <u>Los Angeles Waterkeeper</u>

LAWK is a nonprofit 501(c)(3) public benefit corporation organized under the laws of

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), and Order No. 2014-0057-DWQ ("2015 Permit") as amended in 2015 and 2018.
[3] *See* 40 C.F.R. § 135.2(a)(1).

*AireMasters*
May 24, 2024
Page 2

California with its main office located in downtown Los Angeles, California. LAWK was founded in 1993. LAWK is dedicated to the preservation and defense of the rivers, creeks, and coastal waters of Los Angeles County. The organization works to achieve these goals through education, outreach, organizing, litigation, and advocacy. To further this mission, LAWK actively seeks federal and state implementation of the Clean Water Act. Where necessary, LAWK directly initiates enforcement actions on behalf of itself and its members.

Members of LAWK live, work, recreate, and/or otherwise use and enjoy the areas in and around the waters into which the Facility discharges, including the San Gabriel River Reaches 1 and 2, San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean (collectively, "Receiving Waters"). Members of LAWK use the Receiving Waters to swim, boat, kayak, surf, bird watch, view wildlife, fish, hike, bike, walk, run, general aesthetic enjoyment, and/or for educational opportunities or developing educational tools. Additionally, members of LAWK use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests LAWK's members have been, are being, and will continue to be adversely affected by the Facility Owners and/or Operators' failure to comply with the Clean Water Act and the Industrial General Permit.

### 1.2. __The Owners and/or Operators of the Facility__.

Information available to LAWK indicates that AireMasters owns and/or operates the Facility located 12556 Mcann Drive, Santa Fe Springs, California, 90670. Certain classified facilities that discharge storm water associated with industrial activity are required to submit a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Industrial General Permit coverage.[4] The Facility submitted its NOI on July 18, 2022, which is publicly available via the Storm Water Multiple Application & Reporting Tracking System ("SMARTS") database. The NOI lists "Charles Thompson" as contact for the Facility's operator. Charles Thompson is also listed as the Legally Responsible Person on the Facility's Storm Water Pollution Prevention Plan ("SWPPP"), which was uploaded to SMARTS on July 7, 2022.

The Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Industrial General Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owners and/or Operators are liable for violations of the Industrial General Permit and the Clean Water Act.

### 1.3. __The Facility's Industrial General Permit Coverage__.

AireMasters conducts industrial activities that are subject to the Industrial General Permit. The Facility's NOI lists the Facility's Standard Industrial Classification ("SIC") code as 3444 (sheet metal work). This SIC code requires Industrial General Permit coverage.

The Facility's Waste Discharge Identification ("WDID") number is 4 19I029858. According to the Facility's NOI, the Facility is 0.7 acres, with 0.2 acres exposed to storm water.

---

[4] *See* 2015 & 2020 Permits, Attachment A.

AireMasters
May 24, 2024
Page 3

The Facility provides commercial heating, ventilation, and air conditioning ("HVAC") fabrication and installation services.[5] AireMasters has been operating under the SIC code 3444 at its current location since at least 2016 but did not apply to enroll under the Industrial General Permit until 2022.[6] Therefore, AireMasters has been in violation of the Industrial General Permit for at least the past five years, whether it be the failure to enroll under the Industrial General Permit or for failure to comply with all its terms.

LAWK puts the Facility Owners and/or Operators on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Industrial General Permit coverage. In addition, the Industrial General Permit's definition of "storm water associated with industrial activities," as well as the Permit's explanation of material handling activities, requires Permit coverage for all storm water from non-industrial sources that comingles with industrial storm water. Because the Facility lacks best management practices ("BMPs") or other controls to separate industrial storm water flows from portions of the Facility where non-regulated activities may occur, industrial storm water at the Facility comingles with potential non-storm water, and thus all storm water discharges from the Facility require coverage under the Industrial General Permit.

### 1.4. <u>Storm Water Pollution and the Receiving Waters</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around Los Angeles County, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from the Facility contain excessive concentrations of the metals such as zinc, iron, and aluminum, nutrients such as nitrogen, and pH-affecting substances. Storm water discharges from the Facility enter the Santa Fe Springs municipal separate storm sewer system ("MS4"), and thereafter flows into the San Gabriel River, San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean.[7] Discharges of polluted storm water pose threats to public health and adversely affect the aquatic environment and surrounding ecosystems.

Polluted discharges from the Facility harm the ecological significance of the Receiving Waters, which adversely impact the public's ability, as well as that of LAWK's members, to use and enjoy these unique waterbodies. The Receiving Waters into which the Facility discharges polluted storm water are ecologically sensitive areas.

Polluted discharges from the Facility also harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of LAWK's members, to use and enjoy these unique waterbodies. Trails and observation points along the San Gabriel River are frequently used for jogging, hiking, birdwatching, photography, general

---

[5] SWPPP at § 1.1.
[6] *See* https://web.archive.org/web/20160623065233/https://www.airemasters-ac.com/contact/ (an archive of AireMasters' website from June 23, 2016 showing the Facility address).
[7] *See* SWPPP at § 2.1.

*AireMasters*
May 24, 2024
Page 4

aesthetic enjoyment, scientific study, and data collection, among other things. Just downstream from the Facility are popular hiking and trail-running destinations. The San Gabriel River meets the Pacific Ocean near popular paddleboarding, kayaking, surfing, and swimming locations.

Pollutants discharged from the Facility can affect the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including LAWK members' ability, to use and enjoy these unique recreational and scientific opportunities. Such pollution can also negatively impact human health. Further, LAWK's members are less likely to recreate in and around such waters that are known to be polluted with harmful metals, excessive nutrients, and other pollutants.

The *Los Angeles Regional Water Quality Control Board Basin Plan* ("LA Basin Plan" or "Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the San Gabriel River Reach 1 and 2 include municipal and domestic supply; warm-freshwater habitat; and wildlife habitat. The San Gabriel River Reach 2 also has industrial service supply; industrial process supply; groundwater recharge; warm-freshwater habitat; and rare, threatened, or endangered species.[8] The Beneficial Uses for San Gabriel River Estuary include industrial service supply; navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. The Beneficial Uses of Alamitos Bay include industrial service supply; navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species; wetland habitat; and shellfish harvesting. The Beneficial Uses for near and offshore zones of the Pacific Ocean in Los Angeles include industrial service supply; navigation; commercial and sport fishing; marine habitat; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. For the nearshore zones, the Beneficial Uses also include the preservation of biological habitats.

According to the current 303(d) List of Impaired Water Bodies, the San Gabriel River Reach 2 is impaired for lead, temperature, and cyanide. The San Gabriel River Reach 1 is impaired for pH and temperature. The San Gabriel River Estuary is impaired for dioxin, copper, nickel, dissolved oxygen, and indicator bacteria. Alamitos Bay is impaired for dissolved oxygen and indicator bacteria. San Pedro Bay near off shore zones is impaired for total DDT (sum of 4,4'- and 2,4'- isomers of DDT, DDE, and DDD), chlordane, PCBs, toxicity, and DDT.[9] The 2024 List of Impaired Water Bodies, currently awaiting EPA approval per 33 U.S.C. § 1313 (d)(2), includes additional pollutants, most notably: (1) aluminum and indicator bacteria for the San Gabriel River Reach 2; (2) oil and grease and indicator bacteria for San Gabriel River Reach 1; (3) chlordane and chlorine for the San Gabriel River Estuary; (4) copper, PCBs, DDD, and DDT for Alamitos Bay; and (5) copper and DDE for San Pedro Bay.[10]

---

[8] Basin Plan at Table 2-2.

[9] 2022 Integrated Report – All Assessed Waters, *available at* https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2020_2022_integrated_report.html.

[10] Final 2024 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=f0e4ac76fd0e4a53bebead89339ef3c9.

## 2. THE FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1. <u>The Facility Site Description and Industrial Activities</u>.

AireMasters "produces custom HVAC systems with ducting."[11] For these custom HVAC systems, AireMasters engages in metal fabrication activities like making metal ducts and exhaust fans, and compiling components of an HVAC system.[12] The SWPPP alludes to the following as industrial activities that may pollute storm water: non-storm water discharges; vehicle and equipment fueling, maintenance, and repair; outdoor loading and unloading; outdoor equipment operations; outdoor storage of materials; waste handling and disposal; and building maintenance and repairs.[13]

All areas of the Facility discharge to the north, out the driveway to McCann Drive, and then to a stormwater drain inlet 250 feet east of the driveway. Industrial activities are located within the building and the yard south of the building. Industrial activities in the yard are exposed to stormwater and discharges are conveyed along the V-drain to the drain inlet located at McCann Drive (DA-01).[14] The Facility is located within the Lower San Gabriel River watershed. The Facility's stormwater flows into the Santa Fe Springs MS4, which discharges into the San Gabriel River Reach 2.[15]

### 2.2. <u>Pollutants and Pollutant Sources Related to the Facility's Industrial Activities</u>.

The Facility's industrial activities contribute a variety of pollutants to its storm water and non-storm water discharges. The Facility's samples establish that the Facility discharges high concentrations of metals such as zinc, aluminum, and iron, pH-affecting substances, and nutrients such as nitrogen, in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment.[16] Self-monitoring reports under the Industrial General Permit are deemed conclusive evidence of an exceedance of a permit limitation.[17]

According to the SWPPP, certain areas of industrial activity at the Facility are associated with specific storm water pollution threats.[18] The industrial activities listed in section 2.1 *supra*, are associated with pH, total suspended solids, oil and grease, aluminum, iron, and zinc.[19] As discussed section 3.4 and 3.5 *infra*, the Facility's industrial activities are also associated with the potential pollutant, nitrogen. These pollutants interact with and contaminate storm water indirectly through foot or forklift traffic in the production areas. Additionally, there is direct pollutant exposure to storm water from outdoor storage, manufacturing, loading and unloading, waste disposal, and other outdoor activities.

---

[11] SWPPP at § 2.1.2.
[12] SWPPP at Table 2.1
[13] SWPPP at Table 3.1.
[14] SWPPP at Appendix A.
[15] LADPW Storm Drain System, *available at* https://egis-lacounty.hub.arcgis.com/maps/c62ae2f244f04e8086c89e8db3f530d8/explore?location=33.954053%2C-118.061545%2C14.37.
[16] Ex. 1, Facility's storm water sampling data.
[17] *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).
[18] SWPPP at Table 2.1.
[19] SWPPP at Table 2.1.

*AireMasters*
May 24, 2024
Page 6

As noted in sections 3.4 and 3.5, *infra*, the Facility's SWPPP has failed and continues to fail to include an adequate description of potential pollutant sources and associated pollutants.

Information available to LAWK indicates that many of the aforementioned industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, many pollutants associated with industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the Facility. Information available to LAWK indicates the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress. This results in employees, customers, and vehicles tracking metal particles, nutrients, sediment, O&G, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact LAWK members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

## 3.  VIOLATIONS OF THE CLEAN WATER ACT AND THE INDUSTRIAL GENERAL PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge pollutants.[20]

On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Industrial General Permit was reissued ("2015 Permit"). On July 1, 2020, pursuant to Order 2014-0057-DWQ as amended in 2015 and 2018 ("2020 Permit"), the reissued 2020 Industrial General Permit took effect. As explained below, the 2020 Permit includes terms that are as stringent or more stringent than the 2015 Permit. Accordingly, the Facility Owners and/or Operators are liable for violations of the 2015 Permit and ongoing violations of the 2020 Permit, and civil penalties and injunctive relief are available remedies.[21]

### 3.1. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Discharge Prohibitions.</u>

The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this

---

[20] *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

[21] *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853–54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121–22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

*AireMasters*
May 24, 2024
Page 7

General Permit or another NPDES permit."[22] The Discharge Prohibition provisions prohibit the direct or indirect discharge of liquids or materials other than non-storm water discharges ("NSWDs"), which are not otherwise authorized by a NPDES permit, to the waters of the United States.[23] "Measures to control sources of unauthorized NSWDs such as spills, leakage, and dumping, must be addressed through the implementation of Best Management Practices (BMPs)."[24]

These provisions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code.[25] The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to LAWK indicates the Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Facility's storm water monitoring data demonstrates the Facility has discharged, and continues to discharge, concentrations of metals such as zinc, iron, and aluminum, nutrients such as nitrogen, and pH-affecting substances in excess of various water quality objectives, benchmarks, and other standards that were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.[26] Such discharges of polluted storm water violate the Industrial General Permit.[27]

The SWPPP acknowledges that the Facility may discharge unauthorized NSWDs and states that BMPs will be implemented to prevent these discharges.[28] The SWPPP also contradicts itself and states that no activities at this Facility would result in unauthorized NSWDs.[29] Without more information, LAWK must assume that unauthorized NSWDs may occur at the Facility and the Facility lacks BMPs to prevent said discharges. Without effective BMPs in place, each time the Facility discharges non-storm water into the municipal storm drain, the Facility violates Discharge Prohibition III.B. of the 2015 & 2020 Permits.

Section III.D of the 2015 & 2020 Permits states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The Basin Plan designates beneficial uses for water bodies in the Los Angeles region and establishes water quality objectives and implementation plans to protect those beneficial uses.[30] The Basin Plan has

---

[22] 2015 & 2020 Permits § III.A.

[23] 2015 & 2020 Permits § III.B.

[24] 2015 & 2020 Permits § I.C.28.

[25] 2015 & 2020 Permits § III.C.

[26] *See* Ex. 1.

[27] *See* 2015 & 2020 Permits § III.C; *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

[28] SWPPP at Table 3.1.

[29] *Id*. at § 2.4.

[30] *See* https://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/basin_plan_documentation.html/ for the updated Basin Plan.

*AireMasters*
May 24, 2024
Page 8

narrative and numerical objectives to implement its water quality objectives. For example, for toxicity, "(a)ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."[31]  As to pH, "[t]he pH of inland surface waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges."[32] Accordingly, where the "quality of the discharge" does not meet these water quality objectives, the discharge is prohibited by Discharge Prohibition III.D of the 2015 & 2020 Permits.

LAWK's review of available information and the analytical results of storm water sampling at the Facility demonstrate that the Facility Owners and/or Operators have violated and continue to violate Discharge Prohibition III.D of the 2015 & 2020 Permits by discharging pollutants in excess of water quality objectives listed in the Basin Plan, and other "statewide water quality control plans" such as the California Toxics Rule ("CTR"). [33] The Facility's own monitoring data shows concentrations of zinc in excess of the CTR.[34] By exceeding the CTR, the Facility discharges these toxic metals in such a way as to produce detrimental responses in human, plant, animal, and aquatic life.[35] Further, the data shows pH-affecting substances depressing the pH below 6.5, a Basin Plan prohibition.

Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D. Although the Facility did not sample before its enrollment in 2022, the recent samples from the Facility are the best evidence of the Facility's historic pollutant concentrations between 2019 and 2022.

LAWK puts the Facility Owners and/or Operators on notice that the Industrial General Permit Discharge Prohibitions are violated each time storm water discharges from the Facility.[36] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 & 2020 Permits. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 & 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since May 15, 2019, and LAWK will update the dates of violations when additional information and data become available. The Facility Owners and/or Operator are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

---

[31] Basin Plan at 3-45.

[32] *Id*. at 3-40.

[33] 40 C.F.R. § 131.38.

[34] Ex. 1.

[35] The CTR was developed "based on the Administrator's determination that the numeric criteria are necessary in California to protect human health and the environment." https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

[36] *See* Exhibit 2, which includes the dates of all precipitation events above .1 inches recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic and Atmospheric Administration at a weather monitoring station geographically nearest to the Facility with complete precipitation records. LAWK will include additional dates of rain events when that information becomes available. Data Codes: DAPR - Number of days included in the multiday precipitation total (MDPR); PRCP – Precipitation; MDPR - Multiday precipitation total (use with DAPR and DWPR, if available).

*AireMasters*
May 24, 2024
Page 9

Further, LAWK put the Facility Owners and/or Operators on notice that Discharge Prohibitions III.B, III.C, and III.D are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 & 2020 Permits does not amount to compliance with the Discharge Prohibition provisions.

### 3.2. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Effluent Limitations.</u>

The Industrial General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[37]

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation V.A of the 2015 & 2020 Permits.[38] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[39]

Information available to LAWK indicates that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility. The Facility's storm water monitoring data indicates that the Facility's storm water discharges exceed the EPA benchmarks for zinc, aluminum, and nitrate+nitrite. For example, on November 15, 2023, the Facility discharged concentrations of zinc at 11 mg/L, over 90 times higher than the benchmark of 0.12 mg/L.[40] AireMasters's storm water sampling data also demonstrates annual NAL exceedances for aluminum, iron, nitrate+nitrite, and zinc. For example, the Facility has discharged iron as high as 5 mg/L, five times higher than the NAL of 1 mg/L. The Facility will therefore enter Level 1 status for iron, zinc, and nitrate+nitrite this July.[41]

Thus, the Facility Owners and/or Operators have failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of the Industrial General Permit. Although the

---

[37] 2015 & 2020 Permits § V.A.

[38] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Fed. Reg. 64839 (2000).

[39] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

[40] *See* Ex. 1.; 2021 MSGP Benchmarks are available at https://www.epa.gov/sites/default/files/2021-01/documents/2021_msgp_-_permit_parts_1-7.pdf (See Table 4-2).

[41] When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process.2015 & 2020 Permits § XII.C.

*AireMasters*
May 24, 2024
Page 10

Facility did not sample before its enrollment in 2022, the recent samples from the Facility are the best evidence of the Facility's historic pollutant concentrations between 2019 and 2022, and the ongoing failure to achieve BAT/BCT. The Facility's storm water discharge from 2019 to 2022 thus likely contained pollutants in concentrations that similarly exceeded the Effluent Limitations.

LAWK puts the Facility Owners and/or Operators on notice that the Industrial General Permit Effluent Limitations are violated each time storm water discharges from the Facility.[42] These violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation V.A of the 2015 & 2020 Permits is a separate and distinct violation of the Industrial General Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since May 15, 2019, and LAWK will update the dates of violations when additional information and data become available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 15, 2019.

Further, LAWK puts the Facility Owners and/or Operators on notice that the 2015 & 2020 Permits Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 & 2020 Permit does not amount to compliance with Effluent Limitation V.A.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Receiving Water Limitations.</u>

The Receiving Water Limitations of the 2015 & 2020 Permits prohibit storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[43] The Basin Plan designates Beneficial Uses for the Receiving Waters. WQS are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above WQS contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable WQS include, among others, the CTR standards and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable basin plan.[44] The CTR and Basin Plan are applicable WQSs under the Industrial General Permit. Discharges that contain pollutants in excess of an applicable WQS violate the Industrial General Permit Receiving Water Limitations.

Receiving Water Limitation VI.B of the 2015 & 2020 Permit prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Industrial General Permit Receiving Water Limitation.[45]

---

[42] *See* Ex. 2.
[43] 2015 & 2020 Permits § VI.A.
[44] *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–67 (9th Cir. 1999).
[45] 2015 & 2020 Permits § VI.B.

*AireMasters*
May 24, 2024
Page 11

The Facility's own sampling data demonstrates that the Facility has discharged numerous pollutants in excess of various applicable WQS, thus violating the Permit's Receiving Water Limitations. This data demonstrates the Facility has discharged zinc, aluminum, and nitrogen in excess of its respective CTR and/or EPA Benchmarks.[46] CTR exceedances also violate the Basin Plan's objective to prohibit discharges of toxic substances, like toxic metals, in such a way as to produce detrimental responses in human, plant, animal, and aquatic life.[47] The Facility has also discharged storm water with pH-affecting substances in excess of its Basin Plan objective.[48]

As explained *supra*, the Receiving Waters are impaired, and thus unable to support designated Beneficial Uses for some of the same pollutants discharged by the Facility. The San Gabriel River Reach 1 is impaired for pH. The storm water samples collected from the Facility on November 15, 2023 show the pH at 6, which is below the Basin Plan objectives.

The San Gabriel River Estuary is impaired for dissolved oxygen. Excess concentrations of nutrients such as nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain.[49] High nitrogen loading also results in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes.[50] As such, the Facility's polluted discharges cause and/or contribute to the San Gabriel River Estuary's dissolved oxygen impairment.

The San Pedro Bay is impaired for toxicity. Zinc is a highly toxic pollutant in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR.[51] The Facility's discharges of zinc in excess of the CTR standards cause and/or contribute to the toxicity impairments of the San Pedro Bay.

The Basin Plan and CTR are applicable WQSs under the Industrial General Permit. Therefore, the Facility's frequent and ongoing storm water discharges containing concentrations of multiple pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit.[52]

Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Industrial General Permit Receiving Water Limitations.[53] Although the Facility did not sample before its enrollment in 2022, the recent samples from the Facility are the best evidence of the Facility's historic pollutant concentrations between 2019 and 2022. Such discharges during each

---

[46] *See* Ex. 1.

[47] The CTR was developed "based on the Administrator's determination that the numeric criteria are necessary in California to protect human health and the environment." https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

[48] *Id*.

[49] U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Apr. 15, 2019)*.

[50] U.S. EPA, *Memorandum, Nutrient Pollution and Numeric Water Quality Standards* (May 5, 2007) https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-may252007.pdf

[51] 40 C.F.R. § 131.38.

[52] 2015 & 2020 Permits § VI.A.

[53] *See* 2015 & 2020 Permits § VI.B.

*AireMasters*
May 24, 2024
Page 12

rain event from 2019-2022 thus likely contained pollutants in concentrations that similarly exceeded the Receiving Water Limitations.

LAWK puts the Facility Owners and/or Operators on notice that Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility.[54] Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation VI.A of the 2015 & 2020 Permits, and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.B of the 2015 & 2020 Permits, and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit Receiving Water Limitations. The Facility Owners and/or Operators have been in violation since at least May 15, 2019, and LAWK will update the dates of violation when additional information and data become available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

Further, LAWK puts AireMasters on notice that Receiving Water Limitations are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 & 2020 Permits does not amount to compliance with the Receiving Water Limitations.

### 3.4. <u>Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan</u>.

The Industrial General Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities.[55] The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities.[56] A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Industrial General Permit.

The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of

---

[54] *See* Exs. 1, 2.
[55] 2015 & 2020 Permits §§ X.A–B.
[56] 2015 & 2020 Permits § X.C.

individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan ("MIP").[57]

Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the Industrial General Permit.[58] The 2015 & 2020 Permits require dischargers to certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions.[59] Dischargers are also required to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP.[60]

AireMasters has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, and the subsequent discharge of pollutants from the Facility, in violation of the Industrial General Permit. Generally, the SWPPP contains an inaccurate description of the potential pollutant sources and associated pollutants and lacks BMPs for those potential pollutant sources.[61]

The SWPPP fails to note all industrial activities that occur onsite to effectuate its HVAC manufacturing.[62] The SWPPP lists only fabrication in its Industrial Activities and Associated Materials Table. The SWPPP alludes to more industrial activities in its BMP Summary Table, which suggests that equipment maintenance and material storage may also be industrial activities conducted onsite.[63] The Facility also engages in sheet metal work, which involves cutting, hammering, and other activities that result in dust, debris, and metal shavings. Thus, the SWPPP's failure to appropriately describe these activities as dust generating and to designate and implement appropriate BMPs is improper. The SWPPP must contain more than a generic list of industrial activities – it must describe the activities and their locations on site.[64]

As a result of the Facility's failure to identify all industrial activities, the SWPPP lacks information regarding pollutants associated with those activities. The Industrial General Permit requires the Facility to test for nitrate+nitrite because sheet metal fabrication is associated with these pollutants. For example, the EPA Industrial Stormwater Fact Sheet for Sector AA (Fabricated Metal Products Manufacturing Facilities) notes nitrogen is associated with surface treatment activities.[65] The Facility's sampling data makes this apparent as well – the discharges exceeded water quality standards for nitrate+nitrite, yet the SWPPP failed to identify a potential pollutant source for nitrogen. Further, the SWPPP claims no pollutants are associated with indoor activities, despite the potential for foot traffic and equipment ingress/egress to result in track out.

---

[57] 2015 & 2020 Permits §§ X.A–I.
[58] 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1.
[59] 2015 & 2020 Permits § X.B.2.
[60] 2015 & 2020 Permits §§ X.B, XV.
[61] *See generally* 2015 & 2020 Permits § X.
[62] *Id*. at § X.G.1.
[63] SWPPP at Tables 2.1, 3.4.
[64] 2015 & 2020 Permits § X.G.
[65] https://www.epa.gov/sites/default/files/2015-10/documents/sector_aa_fabmetal.pdf

*AireMasters*
May 24, 2024
Page 14

Because the Facility fails to list all the industrial activities and associated pollutants, the SWPPP likewise fails to identify and implement BMPs that account for those activities.[66] Indeed, the SWPPP lacks an adequate BMP section. The SWPPP simply lists general BMPs without any specificity to this Facility's needs.[67]

The SWPPP also contains contradictory statements. In section 2.4, the SWPPP claims that "fueling areas" are "non-applicable" to the site map. However, Table 3.1 claims that BMPs need to be implemented for vehicle and equipment fueling. These inconsistencies cast doubt on the SWPPP's accuracy.

The 2015 & 2020 Permits require that the Facility establish a Pollution Prevention Team, which implements the SWPPP. It must also contain procedures for an alternate team member in the event someone on the Pollution Prevention Team cannot carry out their duties.[68] The Facility's SWPPP does contain a Pollution Prevention Team; however, it fails to name the procedures to identify an alternate.[69]

The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision.[70] Despite the significant concentrations of pollutants in the Facility's storm water discharges, information available to LAWK indicates the Facility's SWPPP has not been revised to include additional BMPs to eliminate or reduce pollutants in the Facility's storm water discharges, as required by the Permit. Indeed, the Facility has not uploaded any SWPPP amendments to the SMARTS database.

Further, because the Facility failed to enroll in the Industrial General Permit until 2022, the Facility likely operated without an adequate SWPPP (or any SWPPP) for years.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit SWPPP requirements since at least May 15, 2019. These violations are ongoing, and LAWK will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.5. **Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.**

The Industrial General Permit requires permittees to develop and implement a storm water MIP prior to conducting industrial activities.[71] The MIP objectives are to ensure BMPs have been

---

[66] SWPPP at § 2.
[67] SWPPP at Table 3.4.
[68] 2015 & 2020 Permits § X.D.
[69] SWPPP at § 1.4.
[70] 2015 & 2020 Permits § X.B.
[71] 2015 & 2020 Permits, §§ X.I, XI.

adequately developed, implemented, and revised, and confirm compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.[72] The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges.[73]

Sections XI.B.6.a–b of the 2015 & 2020 Permits require permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 & 2020 Permits requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, Facility Owners and/or Operators are required to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. Section XI.B.6.e of the 2015 & 2020 Permits also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act section 303(d) listed impairment(s) or approved Total Maximum Daily Loads. Table 1 in Section XI of the 2015 & 2020 Permits lists additional pollutants associated with certain SIC codes for which a facility must also sample its discharges.

Sections XI.B.1–5 of the 2015 & 2020 Permits require permittees to collect storm water discharge samples from a qualifying storm event ("QSE")[74] as follows: (1) from each drainage area at all discharge locations, (2) from two (2) storm events within the first half of each Reporting Year (July 1 to December 31), (3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and (4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The Industrial General Permit requires dischargers to conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized NSWDs.[75]

The Facility Owners and/or Operators have failed and continue to fail to collect the required number of storm water samples for each reporting period. The Industrial General Permit requires facilities to collect four samples each reporting period. However, in the 2022/2023 reporting year, the Facility sampled zero QSEs. The 2023 annual report attributes this failure to lack of trained staff and claims that it implemented the necessary training.[76] However, in the 2023/2024 reporting year, the Facility only collected one out of the two required samples during the first half, and the Facility has only collected one sample thus far for the second half, despite a year of record-high rainfall. AireMasters's failure to collect the required number of storm water samples has resulted in numerous ongoing and continuous violations of the Industrial General Permit.

The Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to LAWK, including the Facility's repeated violations of Discharge Prohibitions,

---

[72] 2015 Permit §§ I.J.55–56, X.I, XI; 2015 & 2020 Permits §§ X.I, X, I.K.69–70.

[73] 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2015 & 2020 Permits Fact Sheet § J at 138.

[74] A qualifying storm event is defined as one that produces a discharge for at least one drainage area and is preceded by 48-hours with no discharge from any drainage areas. 2015 & 2020 Permits § XI.B.1.

[75] *Id*. § XI.A.1.

[76] The CWA is a strict liability statute. A failure to follow the terms of a permit is not excused by mistake, neglect, or any other mental state. *See* 33 U.S.C.A. § 1342 (West); *see also Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.,* 299 F.3d 1007, 1012 (9th Cir. 2002).

Effluent Limitations, and Receiving Water Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Because the Facility failed to enroll in the Industrial General Permit until 2022, the Facility likely also failed to conduct these discharge observations, monitor its BMPs, sample its discharges, or otherwise implement a MIP prior to 2022.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a MIP, in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit MIP requirements since at least May 15, 2019. These violations are ongoing, and LAWK will include additional violations when information becomes available. AireMasters is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.6. Failure to Comply with the Industrial General Permit's Reporting Requirements

The 2015 & 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the Permit, (2) an explanation for any noncompliance of requirements within the Reporting Year (3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.[77] The Industrial General Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy.[78]

In each Annual Report, the Facility Owners and/or Operators certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Industrial General Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Industrial General Permit, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both."[79]

The Facility Owners and/or Operators have submitted an annual report which were certified attesting to the Facility's compliance with the terms of the Industrial General Permit. However, information available to LAWK indicates that these certifications are erroneous. As discussed throughout section 3 of this Notice Letter, the Facility has violated, and continues to violate, numerous provisions of the Industrial General Permit. The Facility's Legally Responsible

---

[77] 2015 & 2020 Permits § XVI.
[78] 2015 & 2020 Permits § XXI.K.
[79] 2015 & 2020 Permits § XXI.N.

*AireMasters*
May 24, 2024
Page 17

Person ("LRP") knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the Industrial General Permit, and thus certifications of these annual reports were erroneous.

Because AireMasters has failed to comply with the Industrial General Permit's reporting requirements and falsified reports and certification, the Facility is in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). AireMasters has been in daily and continuous violation of the Industrial General Permit's reporting requirements every day since at least May 15, 2019. These violations are ongoing, and LAWK will include additional violations when information becomes available. AireMasters is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

## 4.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $66,712.00 per day per violation for violations that occurred after June 15, 2021 and assessed on or after December 27, 2023.

In addition to civil penalties, LAWK will seek injunctive relief preventing further violations of the Clean Water Act pursuant to sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), LAWK will seek to recover its litigation costs, including attorneys' and experts' fees.

## 5.  CONCLUSION

LAWK is willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, LAWK intends to file a citizen suit under section 505(a) of the Clean Water Act for AireMasters's violations of the Industrial General Permit.

Name and Address of Noticing Parties:

Bruce Reznik, Executive Director
bruce@lawaterkeeper.org
Los Angeles Waterkeeper
360 E. 2nd St., Suite 250
Los Angeles, CA 90012
Tel: 310-394-6162

If you wish to pursue settlement discussions, please contact LAWK's legal counsel:

Livia Borak Beaudin
Natalie Clagett
livia@coastlawgroup.com
Coast Law Group, LLP
1140 South Coast Highway 101
Encinitas, CA 92024
Tel: 760-942-8505

Sincerely,

Livia Borak Beaudin
Natalie Clagett
Attorneys for Los Angeles Waterkeeper

## SERVICE LIST

<u>VIA U.S. MAIL</u>

Susana Arredondo
Executive Officer
Los Angeles Regional Water Quality Control Board
320 West Fourth Street, Suite 200
Los Angeles, CA 90013

Michael Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Martha Guzman Aceves
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eric Oppenheimer
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

| No. | Date | Parameter | Units | Result | Basin Plan | CTR | Annual NAL | Benchmark |
|-----|------|-----------|-------|--------|------------|-----|------------|-----------|
| 1 | 1/3/2024 | Zinc | mg/L | 1.2 | | 0.12 | 0.26 | 0.12 |
| 2 | 1/3/2024 | Nitrite-nitrate | mg/L | 1.2 | | | 0.68 | 0.68 |
| 3 | 1/3/2024 | pH | SU | 6 | 6.5-8.5 | | 6-9 | 6-9 |
| 4 | 11/15/2023 | Aluminum | mg/L | 1.7 | | | 0.75 | 1.1 |
| 5 | 11/15/2023 | Iron | mg/L | 5 | | | 1 | |
| 6 | 11/15/2023 | Zinc | mg/L | 11 | | 0.12 | 0.26 | 0.12 |
| 7 | 11/15/2023 | Nitrite-nitrate | mg/L | 2.1 | | | 0.68 | 0.68 |

Exhibit 1: Sampling Data

Page 1

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/14/2024 | 0.21 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/13/2024 | 0.23 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/31/2024 | 0.16 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/30/2024 | 1.69 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/29/2024 | 0.14 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/23/2024 | 0.1 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/6/2024 | 0.52 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/2/2024 | 0.27 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/21/2024 | 0.34 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/20/2024 | 0.62 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/19/2024 | 0.81 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/7/2024 | 0.33 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/6/2024 | 1.46 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/5/2024 | 2.22 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/4/2024 | 1.4 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/1/2024 | 1.67 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/22/2024 | 1.17 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/20/2024 | 0.43 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/3/2024 | 0.18 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/30/2023 | 0.5 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/22/2023 | 0.47 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/21/2023 | 1.29 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/20/2023 | 0.69 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/19/2023 | 0.14 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/15/2023 | 0.19 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 8/21/2023 | 0.35 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 8/20/2023 | 1.89 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 5/4/2023 | 0.17 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/30/2023 | 0.3 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/29/2023 | 0.95 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/22/2023 | 0.35 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/21/2023 | 0.97 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/15/2023 | 1.18 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/14/2023 | 1.68 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/10/2023 | 0.74 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/1/2023 | 0.17 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/28/2023 | 0.24 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/27/2023 | 0.21 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/25/2023 | 1.65 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/24/2023 | 1.41 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 2/23/2023 | 0.11 |

Exhibit 2: Precipitation Data

Page 1

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/30/2023 | 0.5 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/29/2023 | 0.21 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/16/2023 | 0.63 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/15/2023 | 0.51 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/14/2023 | 1.76 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/10/2023 | 0.87 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/9/2023 | 0.69 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/5/2023 | 1.27 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/4/2023 | 0.32 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/31/2022 | 0.94 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/27/2022 | 0.52 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/12/2022 | 0.33 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/11/2022 | 0.62 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/9/2022 | 0.15 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/8/2022 | 1.55 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/2/2022 | 0.11 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 10/12/2022 | 0.26 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 9/9/2022 | 0.12 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/21/2022 | 0.15 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/28/2022 | 1.19 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/30/2021 | 3.32 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/29/2021 | 1.34 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/27/2021 | 0.31 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/26/2021 | 0.12 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/25/2021 | 0.22 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/24/2021 | 0.15 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/23/2021 | 0.91 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/14/2021 | 0.75 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 10/25/2021 | 0.39 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 7/26/2021 | 0.11 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/15/2021 | 0.22 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/11/2021 | 0.23 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/10/2021 | 0.69 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/3/2021 | 0.17 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/29/2021 | 0.33 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/28/2021 | 0.74 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/25/2021 | 0.24 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/23/2021 | 0.21 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/28/2020 | 1.58 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/10/2020 | 0.27 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/9/2020 | 0.77 |

Exhibit 2: Precipitation Data

Page 2

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/7/2020 | 0.33 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 4/6/2020 | 0.67 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/22/2020 | 1.37 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/16/2020 | 0.33 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/13/2020 | 0.48 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/12/2020 | 1.02 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 3/10/2020 | 0.16 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 1/16/2020 | 0.16 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/26/2019 | 0.38 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/25/2019 | 0.86 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/23/2019 | 0.96 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/22/2019 | 0.75 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/8/2019 | 0.19 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/4/2019 | 0.97 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 12/3/2019 | 0.1 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/28/2019 | 0.76 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/27/2019 | 0.29 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 11/20/2019 | 0.41 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 5/19/2019 | 0.25 |
| USW00003167 | HAWTHORNE MUNICIPAL AIRPORT, CA US | 5/16/2019 | 0.38 |

Exhibit 2: Precipitation Data
Page 3